UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

IN RE:

                                        Chapter 7

MICHAEL S. HELMSETTER                       Case No. 19-28687

        Dealer.

_____/

NISSAN NORTH AMERICA, INC.

        Plaintiff,

v.                                     Adv. Pro. No. _____

MICHAEL HELMSTETTER

        Defendant.

_____/

**COMPLAINT OBJECTING TO THE DISCHARGABILITY OF THE DEBTOR'S DEBT
TO NISSAN NORTH AMERICA, INC. AND FOR JUDGMENT THEREON**

      Plaintiff, NISSAN NORTH AMERICA, INC. ("Nissan"), by its undersigned counsel,

and pursuant to Rule 7001(4) *et seq.* of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), brings this Complaint against Defendant, MICHAEL HELMSTETTER,

and states as follows:

**PARTIES AND JURISDICTION**

      1.      Nissan is a corporation organized under the laws of the State of California, is

licensed to do business in the State of Illinois, and regularly conducts business with licensed

motor vehicle dealers who enter into a Nissan Term Dealer Sales and Service Agreement (the

"Dealer Agreement").

2.     NEW CITY AUTO GROUP, INC. ("Dealer") was a motor vehicle dealer that commenced a Chapter 11 proceeding in the United Stated Bankruptcy Court for the Northern District of Indiana, Hammond Division (Case No. 18-21890) (the "Dealer's Chapter 11 Case").

3.     MICHAEL HELMSTETTER, Defendant and Debtor, ("Dealer Principal" or "Debtor") was at all relevant times the chief executive officer, manager, presumably corporate director and a significant equity holder of the Dealer[1].

4.     This is an action to seek an Order of this Court declaring that the Debtor's indebtedness to Nissan is non-dischargeable and granting a judgment in favor of Nissan against the Debtor for the amount due by the Debtor.

5.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

6.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409 in that the Debtor has commenced his voluntary Chapter 7 proceeding in this Court, and would be proper in this district under applicable non-bankruptcy venue provisions.

7.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B)(I).

8.     The Defendant is subject to the jurisdiction of this Court.

## **FACTUAL ALLEGATIONS**

9.     On July 16, 2018, subsequent to 8:00 P.M. Central daylight time (the "Petition Date"), the Dealer filed in the Dealer's Chapter 11 Case a voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") [Dealer's Bankruptcy Case ECF No. 1][2].

---

[1] *See,* Dealer's Statement of Financial Affairs [Dealer's Chapter 11 Case ECF No. 78, question 28].
[2] The Dealer initially filed its Petition for relief as "New City Auto Group, LLC". On September 6, 2018 and September 11, 2018, Dealer filed its *Amended Petition* [Dealer's Bankruptcy Case ECF No. 98] and *Notice of*

1810213v1 941033.0001

10.    Subsequent to the filing of the Petition, the Dealer continued to purportedly operate its business as a debtor in possession.

11.    On or about February 9, 2018, Nissan and Dealer entered into a Dealer Agreement.  A copy of the Dealer Agreement is attached hereto as Exhibit "A".

## THE NEW VEHICLES

12.    During February and March of 2018, at the request of the Debtor, Nissan delivered fifty (50) new motor vehicles (the "New Vehicles") to the Dealer.  Attached hereto as Exhibit "B", and incorporated herein by reference, is a list of each of the New Vehicles sold and delivered by Nissan to Dealer. After the filing of the Chapter 11 Petition, the New Vehicles came into the possession of the Dealer as Debtor in Possession by operation of law.

13.    Nissan sold and delivered the New Vehicles to the Dealer based on the Debtor's representation and as required by the Dealer Agreement that he and the Dealer would have in place appropriate floorplan lending with which to immediately pay for the purchase of the New Vehicles.  The terms of sale for the New Vehicles were payment immediately after delivery.

14.    The Debtor, on behalf of the Dealer, represented and warranted to Nissan that the Dealer had sufficient floorplan financing in place to fully pay for the New Vehicles when they were delivered to the Dealer.  Were it not for the representations of the Debtor, Nissan would not have delivered the New Vehicles to the Dealer.

15.    Following delivery of the New Vehicles to the Dealer, after Nissan's drafts were presented to the purported floorplan lender, the drafts were rejected by the purported lender.  Upon being confronted with the rejection of the drafts, contrary to the Debtor's representations to Nissan prior to the delivery of the New Vehicles to the Dealer, the Debtor subsequently

---

*Amendment of Voluntary Petition to Correct Dealer's Name* [Dealer's Bankruptcy Case ECF No. 111], respectively, amending Dealer's name from "New City Auto Group, LLC" to "New City Auto Group, Inc."

1810213v1 941033.0001

acknowledged that the Dealer did not have floorplan financing in place either at the time the Dealer placed the order for the New Vehicles or when the Dealer accepted delivery of the New Vehicles, but the Debtor failed to advise Nissan of that fact when the New Vehicles were ordered and delivered.

16.    The maintenance of a floorplan financing arrangement and facility was a material obligation of the Dealer under the Dealer Agreement.

17.    Nissan was induced by the Dealer into delivering the New Vehicles based upon the Debtor's representation that Dealer had sufficient floorplan financing in place at the time that the New Vehicles were ordered and delivered.

18.    At the time that the Dealer accepted the delivery of the New Vehicles, and knowing that Nissan was relying on the Debtor's representation and the Dealer's contractual agreement that the Dealer had sufficient floorplan financing in place to pay for the New Vehicles, the Debtor knew that Nissan was relying upon the Debtor's fraudulent inducement in order to deliver the New Vehicles.

19.    As a result of the Dealer's failure and refusal to comply with its agreement with Nissan to immediately pay for the New Vehicles, the Dealer breached the Dealer Agreement.

20.    Upon learning that the drafts for the payment of the New Vehicles had been dishonored, Nissan immediately delivered a demand to the Dealer for the return of and/or payment for each of the New Vehicles.  The Debtor caused the Dealer to fail and refuse to either return or pay for the New Vehicles.

21.    The Debtor caused the Dealer to accept delivery of the New Vehicles knowing that Nissan was relying upon a false and fraudulent representation of the Debtor that the Dealer had sufficient floorplan financing in place in order to pay for the New Vehicles.

1810213v1 941033.0001

22.    Immediately after Nissan learned of the dishonor of the drafts presented to the alleged floorplan lender of the Dealer, Nissan attempted to reclaim the New Vehicles from the Dealer since they were accepted for delivery by the Dealer based upon the fraudulent representations and statements of the Debtor. The Debtor then caused the Dealer to refuse to surrender the New Vehicles to and/or make payment for the New Vehicles.

23.    After receipt of the New Vehicles based upon the fraudulent representations made to Nissan by the Debtor, the Debtor caused the Dealer to divert the proceeds from the sale of the New Vehicles to be paid to, among others, insiders of the Dealer and alleged secured creditors of the Dealer, even though the Debtor knew that the sale proceeds from the New Vehicles should have been paid to Nissan.

24.    After the receipt of the New Vehicles based upon the fraudulent representations made to Nissan by the Debtor, the Debtor, as well as the Dealer under the Debtor's direction, converted property belonging to Nissan to the benefit of the Debtor and the Dealer.

25.    As a result of the sale and delivery of the New Vehicles, the Dealer was indebted to Nissan for the price of the New Vehicles in the amount of $1,305,746.00.

26.    In accordance with the terms of the Dealer Agreement, the Dealer was also indebted to Nissan for reimbursable incentives, parts and other financial obligations.

## THE FRAMEWORK AGREEMENT

27.    On January 22, 2018, in the anticipation of the execution of the Dealer Agreement between the Dealer and Nissan, a Framework Agreement was entered into between Nissan, the Dealer and the Debtor which provided for the structure of improving the image of Nissan as a result of the new ownership of the facility that was to be operated by the Dealer. A copy of the Framework Agreement is attached hereto and marked Exhibit C.

1810213v1 941033.0001

28.     As an inducement for the anticipated and promised contractual performance of the undertakings of the Dealer and the Debtor in the Framework Agreement by the Dealer and the Debtor, Nissan advanced to the Dealer and the Debtor the sum of $1,000,000.00 to be utilized by the Dealer and the Debtor in order to carry out their performance of the contractual obligations to Nissan as set forth in the Framework Agreement.

29.     At the time of the execution of the Framework Agreement by the Dealer and the Debtor, the Debtor knew that neither he nor the Dealer could comply or would comply with the terms of the Framework Agreement, and that the execution of the Framework Agreement by Nissan and the payment by Nissan to the Dealer and the Debtor of $1,000,000.00 was fraudulently induced by the Dealer and the Debtor.

30.     The Dealer and the Debtor were in default immediately after the execution of the Framework Agreement, yet the Dealer and the Debtor surreptitiously hid this fact from Nissan.

31.     As a result of the actions of the Debtor on his own behalf and on behalf of the Dealer, the delivery of the $1,000,000.00 by Nissan to the Dealer and the Debtor was procured by fraud, fraudulent inducements, false representations and larceny. At the time that the Dealer and the Debtor inappropriately procured the $1,000,000.00 from Nissan, the Debtor was acting in a fiduciary capacity as the president and chief executive officer of the Debtor.

## SUBSEQUENT FACTS

32.     In accordance with the terms of the Dealer Agreement, and pursuant to applicable Indiana law, on April 13, 2018, Nissan gave the Dealer a notice of default and termination of the Dealer Agreement as a result of its breach and failure in the performance of its obligations under the Dealer Agreement, which notice was received by Dealer on April 16, 2018.

33.    No later than approximately 5:30 PM Central daylight time on July 16, 2018, Nissan terminated the Dealer Agreement, and consequently electronically deleted the Dealer from the Dealer Master File and disconnected the Dealer from its access to the Nissan Dealer computer system.

34.    On August 31, 2018, and after holding an evidentiary hearing, the Bankruptcy Judge in the Dealer's Chapter 11 Case entered an Order finding, in part, that the termination of the Dealer Agreement occurred prior to the filing of Dealer's Bankruptcy Petition [Dealer's Bankruptcy Case ECF Nos. 90 and 91].

35.    On September 18, 2018, Nissan filed an adversary proceeding in the Dealer's Chapter 11 Case against the Dealer, the Debtor herein, and other purported secured creditors and insiders of the Dealer [Adv. Pro 18-20255] (the "Indiana Adversary Proceeding") seeking declaratory, injunctive and equitable relief, as well as damages.

36.    As of the filing of the Petition in this case, the Debtor was in default in failing to respond to the Complaint in the Indiana Adversary Proceeding, and Nissan had filed a Motion for the Entry of a Default against the Debtor. As a result of the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code, Nissan is precluded from further pursuing the Debtor in the Indiana Adversary Proceeding.

37.    In the Dealer's Chapter 11 Case, the attorney for the Dealer and the attorney for Nissan worked together to effect a sale of substantially all of the Dealer's assets free and clear of liens and claims. Simultaneously therewith, the Dealer and Nissan entered into a settlement agreement with respect to the Indiana Adversary Proceeding (as the Dealer only) whereby upon the approval of the sale of the Debtor's assets, Nissan would be paid $1,000,000.00 from the proceeds of the sale to be applied to the unpaid balance owing for the New Vehicles, and Nissan

would be entitled to an unsecured claim in the Dealer's Chapter 11 Case for the unpaid balance for the purchase price of the New Vehicles.

38.    On June 14, 2019, the Bankruptcy Judge in the Dealer's Chapter 11 Case entered an Order approving the settlement between the Dealer and Nissan whereby Nissan would be paid $1,000,000.00 from the proceeds of the sale of the Dealer's assets [Dealer's Chapter 11 Case ECF. No. 289].  On the same day, the Bankruptcy Judge in the Dealer's Chapter 11 Case entered an Order approving the sale of substantially all of the Dealer's assets free and clear of liens and claims [Dealer's Chapter 11 Case ECF No. 291].

39.    Upon the Order approving the settlement between the Dealer and Nissan, the Dealer paid Nissan $1,000,000.00 from the proceeds of the sale of the assets. Thereafter, Nissan filed a Motion to Dismiss the Dealer from the Indiana Adversary Proceeding with prejudice.

40.    Both the Dealer Agreement and the Framework Agreement provide for the recovery of attorneys' fees by Nissan in the event of a dispute and default by the Dealer and/or the Debtor.

41.    Nissan has retained the law firm of Tripp Scott, P.A. to represent it in this matter, and is obligated to pay the law firm all reasonable attorneys' fees and costs incurred in the pursuit of the claims set forth herein.

## COUNT I – OBJECTION TO DISCHARGABILITY FOR FRAUD WHILE ACTING IN A FIDUCIARY CAPACITY

42.    Nissan realleges and incorporates paragraphs 1 through 41 as if fully set forth herein.

43.    At all relevant times, the Debtor was an officer and a director of the Dealer. As such, the Debtor had a fiduciary responsibility not only to the Dealer, but also to Nissan based upon his unique knowledge of the facts and his clear understanding that Nissan was relying upon

the representations made to Nissan by the Debtor with respect to ultimate payment for the New Vehicles.

44.    The Debtor expressly promised to Nissan that the Dealer had in place appropriate floorplan lending with which to immediately pay for the New Vehicles.  The term of sale for the New Vehicles was payment immediately after delivery.

45.    In reliance upon the promises and commitments made by the Debtor, Nissan transferred the New Vehicles to the Dealer's possession.

46.    The Debtor's representation that the Dealer had sufficient floorplan financing in place to immediately pay for all new vehicles sold and delivered to the Dealer was of a definite and substantial nature and unequivocal.

47.    The Debtor failed to notify Nissan that the Dealer did not have adequate floorplan financing in place at the time that the Debtor ordered the New Vehicles for the Dealer, notwithstanding the Debtor's knowledge that Nissan was relying on the Debtor's representation and agreement that such floorplan financing facility was being relied on by Nissan as an inducement to deliver the New Vehicles to the Dealer.

48.    The Debtor's promise under the Dealer Agreement to pay for the New Vehicles was of a definite and substantial nature.

49.    At the time the Debtor caused the Dealer to take delivery of the New Vehicles, the Dealer and the Debtor knew that there was no floorplan financing in place to pay for the New Vehicles.

50.    Despite such knowledge, the Debtor knowingly caused the Dealer to accept the New Vehicles from Nissan, while concealing the lack of floorplan financing thereby misleading Nissan to Nissan's detriment.

1810213v1 941033.0001

51.     The Debtor further caused the Dealer to refuse to comply with Nissan's demands that the Dealer return the New Vehicles and/or pay for the New Vehicles to Nissan's detriment.

52.     As a result of Nissan's transfer of the New Vehicles to the Dealer, the Dealer came into possession of the New Vehicles, without payment therefor, in the amount of $1,305,746.00.

53.     Subsequent to the filing of the Petition initiating the Dealer's Chapter 11 Case, the Debtor, as the chief executive officer of the Debtor, acted as the chief executive officer of the Debtor-in-Possession, a fiduciary of the Bankruptcy Court.

54.     Notwithstanding Nissan's continuous and ongoing demand to the Dealer and the Debtor for the return of the remaining New Vehicles or the proceeds from the sale of the New Vehicles, the Debtor, in his capacity as the chief executive officer of the Debtor-in-Possession, failed and refused to surrender the New Vehicles or the proceeds from the sale of the New Vehicles to Nissan.

55.     In receiving the $1,000,000.00 from Nissan under the terms of the Framework Agreement, the Debtor, while acting as a fiduciary as president and chief executive officer of the Dealer when the Debtor knew that neither he nor the dealer would comply with the terms of the Framework Agreement, the Debtor committed fraud against Nissan while acting in a fiduciary capacity.

56.     The Debtor committed fraud as against Nissan while acting in a fiduciary capacity with respect to the procurement of the New vehicles and the receipt of consideration under the Framework Agreement.

WHEREFORE Plaintiff, NISSAN NORTH AMERICA, INC., respectfully requests that this Court (A) enter an order declaring that the obligation and debt of the Debtor to Nissan be

deemed to be nondischargeable, (B) that a judgment be entered against MICHAEL

HELMSTETTER in the amount of $1,305,746.00 plus costs and attorneys' fees, and (C) grant to

Nissan such other and further relief as is proper.

## COUNT II – OBJECTION TO DISCHARGABILITY BASED ON LARCENY.

57.     Nissan realleges and incorporates paragraphs 1 through 41 as if fully set forth

herein.

58.     At the time the Debtor caused the Dealer to take delivery of the New Vehicles, the

Dealer and the Debtor knew that there was no floorplan financing in place to pay for the New

Vehicles.

59.     Despite such knowledge, the Debtor knowingly caused Dealer to accept the New

Vehicles from Nissan, while concealing the lack of floorplan financing and thereby misleading

Nissan to Nissan's detriment.

60.     The Debtor further caused Dealer to refuse to comply with Nissan's demands that

the Dealer return the New Vehicles and/or pay for the New Vehicles to Nissan's detriment.

61.     As a result of Nissan's transfer of the New Vehicles to the Dealer, the Dealer

came into possession of the New Vehicles, without payment therefor, in the amount of

$1,305,746.00.

62.     At all relevant times, the Debtor knew that the Dealer did not have unfettered and

clear title and/or ownership rights to the New Vehicles, since the delivery of the New Vehicles to

the Dealer was procured by the fraudulent representations of the Debtor.

63.     Notwithstanding Nissan's timely and proper demand for the surrender of the New

Vehicles which were procured by the fraud of the Debtor, the Debtor caused the Dealer to refuse

to surrender the New Vehicles to Nissan, and, instead, the Debtor caused the Dealer to sell or

dispose of the New Vehicles without payment to Nissan therefor, effectively committing larceny by the diversion of the proceeds of the sale of the New Vehicles for the benefit of the Dealer and the Debtor.

64.     At the time that the Debtor received the $1,000,000.00 from Nissan under the terms of the Framework Agreement, the Debtor knew that the $1,000,000.00 would not be used by himself or the Dealer to comply with the contractual obligations contained in the Framework Agreement, and committed larceny with respect to the $1,000,000.00 proceeds from the Framework Agreement.

65.     The actions of the Debtor constituted larceny of the property of Nissan.

WHEREFORE Plaintiff, NISSAN NORTH AMERICA, INC., respectfully requests that this Court (A) enter an order declaring that the obligation and debt of the Debtor to Nissan be deemed to be nondischargeable, (B) that a judgment be entered against MICHAEL HELMSTETTER in the amount of $1,305,746.00 plus costs and attorneys' fees, and (C) grant such other and further relief as is proper.

**COUNT III – OBJECTION TO DISCHARGABILITY BASED ON OBTAINING
PROPERTY BY FALSE PRETENSES, A FALSE REPRESENTATION AND BY
ACTUAL FRAUD**

66.    Nissan realleges and incorporates paragraphs 1 through 41 as if fully set forth herein.

67.    The Debtor expressly promised to Nissan that the Dealer had in place appropriate floorplan lending in which to immediately pay for the New Vehicles.  The term of sale for the New Vehicles was payment immediately after delivery.

68.    In reliance upon the promises and commitments made by the Debtor, Nissan transferred the New Vehicles to the Dealer's possession.

69.    The Debtor's representation that the Dealer had sufficient floorplan financing in place to immediately pay for all New Vehicles sold and delivered to the Dealer was of a definite and substantial nature and unequivocal.

70.    The Debtor failed to notify Nissan that the Dealer did not have any floorplan financing in place at the time that the Debtor ordered the New Vehicles for the Dealer, notwithstanding the Debtor's knowledge that Nissan was relying on the Debtor's representation and agreement that such floorplan financing facility was being relied on by Nissan as an inducement to deliver the New Vehicles to the Dealer.

71.    The Debtor's promise under the Dealer Agreement to pay for the New Vehicles was of a definite and substantial nature.

72.    At the time the Debtor caused the Dealer to take delivery of the New Vehicles, the Dealer and the Debtor knew that there was no floorplan financing in place to pay for the New Vehicles.

73.     Despite such knowledge, the Debtor knowingly caused Dealer to accept the New Vehicles from Nissan, while concealing the lack of floorplan financing thereby misleading Nissan to Nissan's detriment.

74.     Nissan would not have delivered the New Vehicles to the Dealer were it not for the false pretenses, false representations and actual fraud of the Debtor.

75.     Nissan would not have delivered the $1,000,000.00 consideration under the Framework Agreement to the Dealer and the Debtor were it not for the false pretenses, false representations and actual fraud of the Debtor.

WHEREFORE Plaintiff, NISSAN NORTH AMERICA, INC., respectfully requests that this Court (A) enter an order declaring that the obligation and debt of the Debtor to Nissan be deemed to be nondischargeable, (B) that a judgment be entered against MICHAEL HELMSTETTER in the amount of $1,305,746.00 plus costs and attorneys' fees, and (C) grant such other and further relief as is proper.

**Dated this 6th day of November, 2019.**               **Respectfully submitted,**

**TRIPP SCOTT, P.A.**
*Counsel for Nissan North America, Inc.*
*U.S.D.C. N.D Ill Bar No.90784989*
110 Southeast 6th Street, 15th Floor
Fort Lauderdale, Florida 33301
Telephone: (954) 525-7500
Facsimile:  (954) 761-8475

By:   */s/ Charles M. Tatelbaum*
          CHARLES M. TATELBAUM
          Florida Bar No. 177540
          cmt@trippscott.com
          hbb@trippscott.com



# NISSAN
# DEALER TERM SALES & SERVICE AGREEMENT

THIS AGREEMENT is entered into effective the day last set forth below by and between the Nissan Division of NISSAN NORTH AMERICA, INC., a California corporation, hereinafter called Seller, and the natural person or entity identified as "Dealer" in the Final Article of this Agreement.

## INTRODUCTION

The purpose of this Agreement is to establish Dealer as an authorized dealer of Nissan Products and to provide for the sale and servicing of Nissan Products in a manner that will best serve the interests of Seller, Dealer, other Authorized Nissan Dealers and owners and purchasers of Nissan Products. This Agreement sets forth: the rights which Dealer will enjoy as an Authorized Nissan Dealer; the responsibilities which Dealer assumes in consideration of its receipt of these rights; and the respective conditions, rights and obligations of Seller and Dealer that apply to Seller's grant to Dealer of such rights and Dealer's assumption of such responsibilities. It is understood that Dealer wishes an opportunity to qualify for a regular Nissan Dealer Sales & Service Agreement for Nissan Products and understands that for that purpose Dealer first must fulfill all of Dealer's undertakings hereinafter described.

This is a personal services Agreement. In entering into this Agreement and appointing Dealer as provided below, Seller is relying upon the personal qualifications, expertise, reputation, integrity, experience, ability and representations of the individual(s) named herein as Principal Owner(s) and Executive Manager.

Achievement of the purposes of this Agreement is premised upon mutual understanding and cooperation between Seller and Dealer. Dealer has entered into this Agreement in reliance upon Seller's integrity and expressed intention to deal fairly with Dealer and the Consuming public. Seller has entered into this Agreement in reliance upon Dealer's integrity and ability and expressed intention to deal fairly with Seller and the consuming public.

It is the responsibility of Seller to market Nissan Products throughout the Territory. It is the responsibility of Dealer to actively promote the retail sale of Nissan Products and to provide courteous and efficient service of Nissan Products. The success of Seller and Dealer will depend on how well they each fulfill their respective responsibilities under this Agreement. It is recognized that: Nissan Motor Co., LTD. (hereinafter called "Manufacturer") will endeavor to provide motor vehicles that offer outstanding value to the consuming public; Seller will endeavor to establish a national network of Authorized Nissan Dealers that can provide effective sales and service effort at the retail level; and Dealer will endeavor to fulfill its responsibilities through aggressive, sound, ethical selling practices and through conscientious regard for customer service.

Seller and Dealer shall refrain from engaging in conduct or activities which might be detrimental to or reflect adversely upon the reputation of Seller, Manufacturer, Dealer or Nissan Products and shall engage in no discourteous, deceptive, misleading or unethical practices or activities.

For consistency and clarity, terms which are used frequently in this Agreement have been defined in Section 1 of the Standard Provisions. All terms used herein which are defined in the Standard Provisions shall have the meaning stated in said definitions. These definitions should be read carefully for a proper understanding of the provisions in which they appear.

To achieve the purposes referred to above, Seller and Dealer agree as follows:

**ARTICLE FIRST:** Appointment of Dealer

Subject to the conditions and provisions of this Agreement, Seller:

(a) appoints Dealer as an Authorized Nissan Dealer and grants Dealer the non-exclusive right to buy from Seller those Nissan Products specified in Dealer's current Product Addendum hereto, for resale, rental or lease at or from the Dealership Location(s) established and described in accordance with Section 2 of the Standard Provisions; and

(b) grants Dealer a non-exclusive right, subject to and in accordance with Section 6.K of the Standard Provisions, to identify itself as an Authorized Nissan Dealer, to display the Nissan Marks in the conduct of its Dealership Operations and to use the Nissan Marks in the advertising, promotion and sale of Nissan Products in the manner provided in this Agreement.

**ARTICLE SECOND:** Assumption of Responsibilities by Dealer

Dealer hereby accepts from Seller its appointment as an Authorized Nissan Dealer and, in consideration of its appointment and subject to the other conditions and provisions of this Agreement, hereby assumes the responsibility for:

(a) establishing and maintaining at the Dealership Location(s) the Dealership Facilities in accordance with Section 2 of the Standard Provisions;

(b) actively and effectively promoting the sale at retail (and, if Dealer elects, the leasing and rental) of Nissan Vehicles within Dealer's Primary Market Area in accordance with Section 3 of the Standard Provisions;

(c) servicing Nissan Vehicles and for selling and servicing Genuine Nissan Parts and Accessories in accordance with Section 5 of the Standard Provisions;

(d) building and maintaining consumer confidence in Dealer and in Nissan Products in accordance with Section 5 of the Standard Provisions; and

(e) performance of the additional responsibilities set forth in this Agreement, including those specified in Section 6 of the Standard Provisions.

**ARTICLE THIRD:** Ownership

(a) *Owners.* This Agreement has been entered into by Seller in reliance upon, and in consideration of, the personal qualifications, expertise, reputation, integrity, experience, ability and representations with respect thereto of the Principal Owner(s) named in the Final Article of this Agreement and in reliance upon Dealer's representations concerning the ownership of Dealer as follows:

(i) Dealer represents and agrees that the person(s) named as Principal Owner(s) in the Final Article of this Agreement, and only those person(s), shall be the Principal Owner(s) of Dealer;

(ii) Dealer represents and agrees that the person(s) named as Other Owner(s) in the Final Article of this Agreement, and only those person(s), shall be the Other Owner(s) of Dealer.

(b) *Holding Company.* Seller requires that a natural person be named as the Principal Owner(s) of Dealer because Seller relies on the personal qualifications, expertise, reputation, integrity, experience, ability and representations of such individuals. If one or more of the owner(s) of Dealer is a corporation, partnership or other entity and not a natural person (hereinafter called "Holding Company"), Dealer and Seller agree that the natural persons listed in the Holding Company Addendum of this Agreement as owners of the Holding Company shall be deemed to be the Principal Owner(s) and Other Owner(s) of Dealer, as the case may be, and that the terms and conditions of this Agreement, including without limitation the provisions of this Article Third and Sections 12 and 15 of the Standard Provisions, shall apply to the owner(s) of the Holding Company as well as to Dealer. Dealer represents to Seller and agrees that the Holding Company is owned as indicated in the Holding Company Addendum to this Agreement.

**EXHIBIT A**

(c) Changes in Ownership. In view of the fact that this is a personal services agreement and in view of its objectives and purposes, this Agreement and the rights and privileges conferred on Dealer hereunder are not assignable, transferable or salable by Dealer, and no property right or interest is or shall be deemed to be sold, conveyed or transferred to Dealer under this Agreement. Dealer agrees that any change in the ownership of Dealer specified herein requires the prior written consent of Seller, excepting only changes in the record or beneficial ownership interest of Other Owners not effecting a change in majority control or interest. Dealer shall give Seller prior notice of any proposed change in said ownership requiring the consent of Seller and immediate notice of the death or incapacity of any Principal Owner. No such change, and no assignment of this Agreement or of any right or interest herein, shall be effective against Seller unless and until embodied in an appropriate amendment to or assignment of this Agreement, as the case may be, duly executed and delivered by Seller and by Dealer. Seller shall not, however, unreasonably withhold its consent to any such change. Seller shall have no obligation to transact business with any person who is not named either as a Principal Owner or Executive Manager of Dealer hereunder or otherwise to give effect to any proposed sale or transfer of the ownership or management of Dealer prior to having concluded the evaluation of such a proposal as provided in Section 15 of the Standard Provisions.

**ARTICLE FOURTH:** Management

(a) Executive Manager. Seller and Dealer agree that the retention by Dealer of qualified management is of critical importance to the successful operation of Dealer and to the achievement of the purposes and objectives of this Agreement. This Agreement has been entered into by Seller in reliance upon, and in consideration of, the personal qualifications, expertise, reputation, integrity, experience, ability and representations with respect thereto of the person named as Executive Manager in the Final Article of this Agreement and on Dealer's representation to seller and agreement that the person identified as Executive Manager shall be Dealer's executive manager, shall have full managerial authority for the Dealership Operations, and shall continually provide his or her personal services in operating the dealership and will be physically present at the Dealership Facilities.

(b) Changes in Management. In view of the fact that this is a personal services Agreement and in view of its objectives and purposes, Dealer agrees that any change in the Executive Manager from that specified in the Final Article of this Agreement requires the prior written consent of Seller. Dealer shall give Seller prior notice of any proposed change in Executive Manager and immediate notice of the death or incapacity of any Executive Manager. No change in Executive Manager shall be effective unless and until embodied in an appropriate amendment to this Agreement duly executed and delivered by Seller and by Dealer. Subject to the foregoing, Dealer shall make its own, independent decisions concerning the hiring and firing of its employees, including, without limitation, its Executive Manager.

To enable Seller to evaluate and respond to Dealer concerning any proposed change in Executive Manager, Dealer agrees to provide, in the form requested by Seller and in a timely manner, all applications and information customarily requested by Seller to evaluate the proposed change. While Seller shall not unreasonably withhold its consent to any such change, it is agreed that any successor Executive Manager must possess personal qualifications, expertise, reputation, integrity, experience and ability which are, in the opinion of Seller, satisfactory. Seller will determine whether, in its opinion, the proposed change is likely to result in a successful dealership operation with capable management that will satisfactorily perform Dealer's obligations under this Agreement. Seller shall have no obligation to transact business with any person who is not named as an Executive Manager of Dealer hereunder prior to having concluded its evaluation of such person.

(c) Evaluation of Management. Dealer and Seller understand and acknowledge that the personal qualifications, expertise, reputation, ability, integrity, experience and ability of the Executive Manager and his or her ability to effectively manage Dealer's day-to-day Dealership Operations is critical to the success of Dealer in performing its obligations under this Agreement. Seller may from time to time develop standards and/or procedures for evaluating the performance of the Executive Manager and of Dealer's personnel generally. Seller may, from time to time, evaluate the performance of the Executive Manager and will advise Dealer and the Executive Manager of the results of such evaluations, and Dealer shall promptly take such action as may be required to correct any deficiencies in the Executive Manager's performance to the reasonable satisfaction of Seller.

**ARTICLE FIFTH:** Additional Provisions

The additional provisions set forth in the attached "Nissan Dealer Sales and Service Agreement Standard Provisions" are hereby incorporated in and made a part of this Agreement excepting only the provisions contained in Section 4, 14 and 16, which sections are deleted in their entirety from this Agreement and shall be of no force and effect. The Notice of Primary Market Area, Dealership Facilities Addendum, Product Addendum, Dealership Identification Addendum, Holding Company Addendum, if applicable, and all Guides referred to in this Agreement (including references contained in the Standard Provisions referred to above) are hereby incorporated in and made a part of this Agreement. Dealer further agrees to be bound by and comply with: the Warranty Manual; Seller's Manuals or Instructions heretofore or hereafter issued by Seller to Dealer; any amendment, revision or supplement to any of the foregoing; and any other manuals heretofore or hereafter issued by Seller to Dealer.

**ARTICLE SIXTH:** Termination of Prior Agreements

This Agreement cancels, supersedes and annuls all prior contracts, agreements and understandings except as stated herein, all negotiations, representations and understandings being merged herein. No waiver, modification or change of any of the terms of this Agreement or change or erasure of any printed part of this Agreement or addition to it (except filling of blank spaces and lines) will be valid or binding on Seller unless approved in writing by the President or an authorized Vice-President of Seller.

**ARTICLE SEVENTH:** Term

This Agreement shall have a term commencing on the effective date hereof and, subject to its earlier termination in accordance with the provisions of this Agreement, expiring on the expiration date indicated in the Final Article of this Agreement. Subject to other applicable provisions hereof, this Agreement shall automatically terminate at the end of such stipulated term without any action by either Dealer or Seller.

**ARTICLE EIGHTH:** License of Dealer

If Dealer is required to secure or maintain a license for the conduct of its business as contemplated by this Agreement in any state or jurisdiction where any of its Dealership Operations are to be conducted or any of its Dealership Facilities are located, this Agreement shall not be valid until and unless Dealer shall have furnished Seller with written notice specifying the date and number, if any, of such license or licenses issued to Dealer, Dealer shall notify Seller immediately in writing if Dealer shall fail to secure or maintain any and all such licenses or renewal thereof or, if such license or licenses are suspended or revoked, specifying the effective date of any such suspension or revocation.

**ARTICLE NINTH:** Initiation of Legal Proceedings

Should a proceeding of any nature be filed with or initiated by any Court or administrative body seeking to prevent or delay Seller from entering into a Nissan Dealer Sales & Service Agreement with Dealer and/or seeking damages resulting from Seller doing so, Seller shall be under no obligation to do so, so long as such proceeding is pending, and if, as a result of such proceeding, Seller shall be enjoined or prevented from entering into a Nissan Dealer Sales & Service Agreement with Dealer, any offer made pursuant to Article Twelfth shall be void, and Seller shall have no liability for any damages which Dealer may suffer thereby.

**ARTICLE TENTH:** Breach By Dealer

Dealer's failure to carry out fully all of the terms and provisions of this Agreement, including those terms and provisions incorporated herein by reference, shall be a breach of the entire Agreement, and Seller shall be under no obligation to Dealer to extend this Agreement in whole or in part or to enter into a regular Nissan Dealer Sales & Service Agreement with Dealer or be under any other obligation to Dealer.

Upon Dealer's failure to meet any interim deadlines set forth in Article Twelfth of this Agreement or the occurrence of any of the other events warranting termination of this Agreement as set forth in Section 12 of the Standard Provisions, Seller may terminate this Agreement, prior to the expiration date hereof, by giving Dealer written notice thereof, such termination to be effective upon the date specified in such notice, or such latter date as may be required by any applicable statute.

**ARTICLE ELEVENTH:** Execution of Agreement

This Agreement, and any Addendum or amendment or notice with respect thereto, shall be valid and binding on Seller only when it bears the signature of either the President or an authorized Vice-President of Seller and, when such signature is a facsimile, the manual countersignature of an authorized employee of Seller and a duplicate original thereof is delivered personally or by mail to the Dealership Location. This Agreement shall bind Dealer only when it is signed by: a duly authorized officer or executive of Dealer if a corporation; one of the general partners of Dealer if a partnership; or Dealer if an individual.

**ARTICLE TWELFTH:** Conditions of Seller's Offer

If this agreement is not terminated prior to the expiration date set forth in the Final Article, Seller may offer to enter into as of such date a Nissan Dealer Sales & Service Agreement in such form as may be in use by Seller at such time. Seller will make the offer and Dealer may accept such offer only if Dealer has fulfilled and continues to fulfill, during the term of this Agreement and at the expiration thereof, all of the following conditions, each of which Dealer understands and agrees to be reasonable and necessary:

(a) Comply with Seller's net working capital, net worth requirements as specified in Section 6.E and in amount not less than the Guides therefor as specified in the Final Article of this Agreement;

(b) Provide Seller, on or before the tenth day of each month, on such forms as may be designated by Seller, with the financial and operating statement specified in Section 6.G.1 of the Standard Provisions;

(c) If New Dealership Facilities are required under Article Twelfth (d), below:

(i)  Complete the acquisition and installation, at the New Dealership Facilities, of signs, furniture, furnishings, tools and equipment as required by Seller for Dealer's New Dealership Facilities;

(ii)  Employ that number of qualified persons to operate the dealership required by Seller for Dealer's New Dealership Facilities;

(iii) Comply with all other of Seller's requirements for Dealer to operate the New Dealership Facilities and qualify in all other respects for a Nissan Dealer Sales & Service Agreement;

(iv) Comply with all federal, state and local governmental licensing and other requirements for Dealer to do business as an Authorized Nissan Dealer at the New Dealership Facilities;

(d) New Dealership Facilities (or upgrade to existing Dealership Facilities, if applicable):

See Exhibit 'C' which is incorporated by this reference into this Agreement for all purposes.                    Initial: _____

A.  Facilities

(e) Other conditions (if any):

See Exhibit 'B' which is incorporated by this reference into this Agreement for all purposes.                    Initial: _____

A.  Sales Performance
B.  Customer Satisfaction Performance
C.  Executive Manager
D.  Service Contract Penetration Performance

**ARTICLE THIRTEENTH:** Special Conditions

See Exhibit 'A' which is incorporated by this reference into this Agreement for all purposes.                    Initial: _____

A.  Seller's Right of First Refusal or Option to Purchase
B.  Exclusivity

**EXHIBIT A:**
This Exhibit is incorporated by reference in and is a part of the Nissan Dealer Term Sales and Service Agreement between Dealer and Seller dated _____. The terms of this Exhibit will be effective throughout the term hereof, and shall be binding on any successors. As a condition of Seller's consent to any change in ownership, Dealer agrees to require any proposed buyer of Dealer's stock or of Dealer's Nissan dealership assets to assume the contractual rights, obligations and provisions in accordance with Seller's Guides and Policies in effect at that time, specifically including those set forth below.

ARTICLE THIRTEENTH, Special Conditions hereby reads as follows:

## A. <u>SELLER'S RIGHT OF FIRST REFUSAL OR OPTION TO PURCHASE</u>

Dealer agrees that, commencing concurrent with the execution date of the Agreement and for so long as Dealer (or its principals) are Authorized Nissan Dealers, if Dealer proposes to sell its principal assets (whether held directly or indirectly by Dealer, Principal Owner, Other Owner(s) or any legal entity affiliated with any of them) or the owners of Dealer propose to sell or transfer a majority ownership interest in Dealer, by stock transfer or otherwise (a "Proposed Transaction"), and in addition to its rights under Articles Third of the Agreement and Section 15 of the Standard Provisions and without in any way derogating from Seller's right to grant or not grant its consent thereto, Seller shall have the right and option pursuant to this Article (1) to purchase the dealership's principal assets or ownership interests (collectively the "Dealership Interests"); and (2) to purchase the Dealership Facilities and any other real property interest used in the dealership operations and included in the transaction (or to take an assignment of any lease) (collectively the "Real Estate Interests") upon the same terms and conditions as the proposed buyer or transferee except as provided hereinafter (the "Purchase Rights").

1. Even if included in the proposed transaction, in exercising its Purchase Rights, Seller may exclude any Dealership Interest or Real Estate Interest associated with any other line-make.

2. If Seller chooses to exercise its Purchase Rights, it shall do so in its written response pursuant to Section 15. Dealer agrees not to complete any Proposed Transaction prior to the expiration of the period for exercise of Seller's Purchase Rights and without Seller's prior written consent. Such exercise shall be null and void if Dealer withdraws its proposal within thirty (30) days following Dealer's receipt of Seller's notice exercising its Purchase Rights.

3. Seller may assign its Purchase Rights to any party, and Seller hereby agrees to guarantee the performance by such assignee pursuant to the Transaction Agreement. Seller's rights under this Article shall be binding on and enforceable against any assignee or successor in interest of Dealer or purchaser of Dealer's assets. Seller shall have no obligation to exercise its rights hereunder.

4. Seller's right under this Article shall be a right of first refusal, enabling Seller to assume the prospective purchaser's rights and obligations under a bona fide written the buy/sell agreement submitted by Dealer to Seller and any other agreement concerning a transfer of the Real Estate Interests (collectively the "Transaction Agreement."). The purchase price and other terms shall be those set forth in the Transaction Agreement. Dealer agrees to provide to Seller the full and complete terms of the Proposed Transaction, including any other agreements or understandings between the parties. If Dealer refuses either to provide such agreements or information or to verify in writing that no such documents exist or that the Transaction Agreements reflects the full and complete terms, NNA shall be entitled to conclude that the Transaction Agreement is not bona fide.

5. As part of Seller's evaluation of the Proposed Transaction pursuant to Section 15, including whether to exercise its Purchase Rights, Seller shall be entitled to conduct reasonable due diligence concerning the Proposed Transaction, the Dealership Interests or the Real Estate Interests, including an environmental evaluation with respect to any real property.

6. In the absence of a bona fide written buy/sell agreement, Seller shall have the option, but no obligation, under this Article to purchase the principal assets of Dealer utilized in the Dealership Operations, including the Dealership Facilities and real property and leasehold interest, and to terminate this Agreement and all rights granted Dealer hereunder. If the Dealership Facilities are leased by Dealer from an affiliated company, the right to purchase the principal assets of Dealer shall include the right to lease the Dealership Facilities. The purchase price of Dealer's assets shall be at their fair market value as a going concern as negotiated by the parties and the other terms of sale shall be those agreed by Dealer and Seller. If Dealer and Seller are unable to reach a negotiated settlement in a reasonable time, the price and other terms of sale shall be established by arbitration in accordance with the rules of the American Arbitration Association. If Seller determines that the buy/sell agreement is not bona fide, Seller will so notify Dealer. Dealer shall have ten (10) days from its receipt of such notice within which to withdraw its proposal. Seller's exercise of its rights hereunder shall be null and void if Dealer withdraws its proposal within such time period.

DEALER:  NEW CITY AUTO GROUP INC.

7. If the Proposed Transaction involves Real Estate Interests, in addition to all the terms and provisions set forth above, Dealer agrees to the following:

   i. In addition to any other or prior right of investigation, within ten (10) days of Seller's exercise, Seller (or its assignee or designee) shall be entitled to perform an environmental study of any of the property involved. Seller's approval of the results of said study (or any earlier study) is a contingency of any obligation by Seller to complete the transaction;

   ii. As an additional condition of Seller's obligation to acquire the Real Estate interests, Dealer shall provide any and all easements, licenses, permits, environmental studies, leases, or other documents affecting such Real Estate Interests;

   iii. As applicable, Dealer shall deliver any property by Warranty Deed or state equivalent conveying free and marketable title, without any liens, encumbrances, mortgages, tenancies or occupancies, and shall ensure a title policy may be obtained to support the marketable title. Seller acknowledges that Dealer is not making any representations concerning the absence of environmental or other liens which are a matter of public record as of the date hereof.

   iv. At Seller's option, Dealer shall execute this right of first refusal in recordable form.

8. Seller and Dealer agree that the Dealership Facilities and/or the Real Estate Interests are unique. If Dealer fails to fully and in good faith perform its obligations hereunder, Dealer agrees that monetary damages would be an inadequate remedy to Seller. The Parties agree that Seller may seek such equitable relief, including specific performance and injunctive relief, as may be available to Seller.

9. In addition to any other rights Seller may have at law, in equity or hereunder, any sale or lease of the Dealership Facilities in violation of the rights of Seller herein shall be voidable by Seller.

## B. **EXCLUSIVITY**

In order for Dealer to maintain competitive Dealership Facilities to effectively market Nissan Products and the Nissan brand, Dealer hereby agrees to abide by and to never challenge the following "Exclusivity Provisions", which incorporate Seller's Facility Usage Policy as may be established or revised by Seller from time to time:

a) The only line-make of new, unused motor vehicles that Dealer shall display, sell, advertise or promote at or from the Dealership Facilities shall be the Nissan line and make of motor vehicles. Dealer agrees not to conduct any dealership operations for any other make or line of new, unused vehicles from the Dealership Facilities. Dealer agrees to market, promote, and sell all Nissan Products from the Dealership Facilities;

b) Dealer shall sell and maintain a full line of Genuine Nissan Parts and Accessories, including service contracts, at the Dealership Facilities and shall provide a full range of automotive servicing for Nissan vehicles at the Dealership Facilities pursuant to Section 5 of the Standard Provisions to the Agreement. Nothing contained herein, however, shall preclude Dealer from offering parts, accessories or servicing for vehicles of other lines or makes so long as such products or services are incidental to Dealer's Nissan dealership operations and do not substitute for the sale of Nissan Products; and

c) Dealer shall not install or maintain any signage at the Dealership Facilities that would detract or conflict with the Nissan Marks or the Nissan brand image or might lead any consumer into believing that any line or make of vehicles other than the Nissan line is sold at the Dealership Facilities.

d) Seller and Dealer agree that the Dealership Facilities are unique. If Dealer fails to fully and in good faith perform its obligations hereunder, Dealer agrees that monetary damages would be an inadequate remedy to Seller. The parties agree that Seller may seek such equitable relief, including specific performance and injunctive relief, as may be available to Seller.

Any failure by Dealer to abide by the foregoing facility requirements shall constitute a material breach of the Agreement and grounds for its termination.

DEALER: NEW CITY AUTO GROUP INC.

**EXHIBIT B:**

This Exhibit is incorporated by reference in and is a part of the Nissan Dealer Term Sales and Service Agreement between Dealer and Seller dated _____. The terms of this Exhibit will be effective throughout the term hereof, and shall be binding on any successors. As a condition of Seller's consent to any change in ownership, Dealer agrees to require any proposed buyer of Dealer's stock or of Dealer's Nissan dealership assets to assume the contractual rights, obligations and provisions in accordance with Seller's Guides and Policies in effect at that time, specifically including those set forth below.

ARTICLE TWELFTH (e) hereby reads as follows:

## A. SALES PERFORMANCE

As set forth in Section 3 of the Standard Provisions, Seller will evaluate Dealer's performance of its sales responsibility for Nissan Cars and Nissan Trucks on the basis of such reasonable criteria as Seller may develop from time to time, including a comparison of Dealer's sales performance to the average sales performance of Nissan Dealers in represented market areas within the state of Indiana. Dealer acknowledges and agrees that such a comparison is a reasonable standard by which to evaluate Dealer's sales performance and compliance with Dealer's Vehicle Sales Responsibilities under the Agreement, and that Dealer's sales performance, as calculated by Seller, must meet or exceed the average sales performance of Nissan dealers in represented market areas in Indiana on a segment-adjusted basis – i.e., 100% State Sales Effectiveness - Represented or "SSER", in order for Dealer to be in compliance with its Vehicle Sales Responsibilities under the Agreement. Dealer further acknowledges and agrees that Dealer must demonstrate a consistent and sustained ability to meet or exceed 100% SSER during the term of this Agreement in order to qualify at the end of the term for Seller's offer of a standard Nissan Dealer Sales & Service Agreement under Article Twelfth, provided this Agreement is not earlier terminated by either party for any reason.

## B. CUSTOMER SATISFACTION PERFORMANCE

Dealer understands and acknowledges that Seller has agreed to accept Dealer as its authorized Nissan Dealer in reliance on Dealer's representation that it will meet or exceed its Customer Satisfaction obligations under the Agreement, including those set forth in Section 5 of the Standard Provisions. Dealer acknowledges that its customer satisfaction performance will be evaluated by Seller on the basis of such reasonable criteria as Seller may develop from time to time, including but not limited to, surveys and indices of consumer satisfaction and retention as compared with performance levels achieved by other Nissan dealers in Dealer's assigned Region, State or District, or such other means as may be deemed appropriate by Seller.

## C. EXECUTIVE MANAGER

The qualifications and performance of **Tina Haddad**, the individual proposed to be named under the Final Article of this Agreement as the Executive Manager of Dealer shall be evaluated by Seller during a six (6) month evaluation period pursuant to Seller's executive management evaluation program. If, at the end of such six-month period, **Tina Haddad** and Dealer's performance in any department of the dealership (including sales, service, parts and customer satisfaction) is not satisfactory to Seller under the evaluation program guidelines, Dealer shall be obligated to retain another individual whom Seller determines, in its sole discretion, is qualified to act as the Executive Manager. Such individual shall be retained and proposed to Seller as the Executive Manager candidate within sixty (60) days of the date that Seller notifies Dealer that **Tina Haddad** has not met the Executive Manager requirements of Seller.

Dealer agrees and acknowledges that the requirement to have a qualified Executive Manager is a reasonable and material requirement of the Agreement; therefore, failure by Dealer to provide a qualified Executive Manager, satisfactory to Seller, shall be considered a material breach of the Agreement and grounds for its termination. If Dealer requests additional time and/or proposes additional Executive Manager candidates, other than as set forth above, Seller may consider any such additional proposals by Dealer, but is not contractually obligated to do so.

## D. SERVICE CONTRACT PENETRATION PERFORMANCE

Dealer understands and acknowledges that Seller has agreed to accept Dealer as its authorized Nissan Dealer in reliance on Dealer's representation that Dealer shall meet or exceed regional average sales penetration of Security+Plus products on or before **July 31, 2018,** based on data available at that time, and on a sustained and consistent basis at all times thereafter.

DEALER:  NEW CITY AUTO GROUP INC.

**EXHIBIT C:**
This Exhibit is incorporated by reference in and is a part of the Nissan Dealer Term Sales and Service Agreement between Dealer and Seller dated _____. The terms of this Exhibit will be effective throughout the term hereof, and shall be binding on any successors.  As a condition of Seller's consent to any change in ownership, Dealer agrees to require any proposed buyer of Dealer's stock or of Dealer's Nissan dealership assets to assume the contractual rights, obligations and provisions in accordance with Seller's Guides and Policies in effect at that time, specifically including those set forth below.

ARTICLE TWELFTH (d) New Dealership Facilities hereby reads as follows:

## A. FACILITIES

In order for Dealer to provide competitive Dealership Facilities to effectively market Nissan Products and the Nissan brand, Dealer shall commence and complete expansion and remodeling of the Dealership Facilities so as to provide exclusive, separate and distinct stand-alone Nissan dealership facilities of a size, appearance and layout meeting Seller's approval and in accordance with the Guides established by Seller, all in accordance with final architectural plans to be submitted to Seller (the "New Dealership Facilities"). Seller has developed facility guidelines for the size, appearance and layout of Nissan dealership facilities overall (hereinafter referred to as the "Nissan Retail Environmental Design Initiative" or "NREDI"). Seller will provide the guidelines to Dealer.  Dealer agrees to provide NREDI-compliant New Dealership Facilities in accordance with the following schedule:

(a)   Dealer shall schedule and complete a design consult on or before **July 31, 2018**;

(b)   Dealer shall submit final architectural plans for the expansion and remodeling of the Dealership Facilities for Seller's approval on or before **October 31, 2018**;

(c)   Dealer shall submit a signed contract for the expansion and remodeling of the New Dealership Facilities on or before **March 31, 2019**;

(d)   Dealer shall commence expansion and remodeling of the Dealership Facilities on or before **June 30, 2019**; and

(f)   Dealer shall i.) complete expansion and remodeling of the Dealership Facilities; ii) successfully complete a NREDI Brand Audit; and iii.) submit all required paperwork to Nissan for processing on or before **June 30, 2020.**

(g)   Seller and Dealer agree that the Dealership Facilities are unique.  Should Dealer, for any reason whatsoever, fail to fully and in good faith perform its obligations as set forth above, Dealer agrees that monetary damages would be an inadequate remedy to Seller.  The parties agree that Seller may seek such equitable relief, including specific performance and injunctive relief, as may be available to Seller.

The New Dealership Facilities must be fully operational on or before **June 30, 2020**. Time is of the essence. Dealer acknowledges that Seller has relied on Dealer's commitment to meet these facility obligations in entering into this Agreement; therefore, failure by Dealer to meet them shall constitute a material breach of this Agreement and grounds for its termination.

DEALER:  NEW CITY AUTO GROUP INC.

N5700

PRIME TIME NIS SCHEREVILL

SCHERERVILLE

| Assignment/VIN | Doc. Date | Invoice No | Reference | Ref. Key 1 | Ref. Key 2 | Amt in loc.cur. |
|---|---|---|---|---|---|---|
| 1N4AL3APXJC138837 | 2/23/2018 | 833298322 | 668748 | 1 | NEWVEHL | 24,221.00 |
| 1N4AL3AP4JC135951 | 2/23/2018 | 833299389 | 668749 | 1 | NEWVEHL | 24,221.00 |
| 5N1AT2MV0JC759045 | 2/23/2018 | 833299601 | 668753 | 1 | NEWVEHL | 26,541.00 |
| 5N1AT2MV1JC759863 | 2/23/2018 | 833299696 | 668769 | 1 | NEWVEHL | 26,541.00 |
| 5N1AT2MV1JC760592 | 2/23/2018 | 833299706 | 668752 | 1 | NEWVEHL | 26,541.00 |
| 5N1AT2MV2JC761301 | 2/23/2018 | 833299773 | 668768 | 1 | NEWVEHL | 26,541.00 |
| 5N1AT2MV1JC762441 | 2/23/2018 | 833300009 | 668754 | 1 | NEWVEHL | 26,541.00 |
| 5N1AT2MV6JC760541 | 2/23/2018 | 833300082 | 668760 | 1 | NEWVEHL | 26,541.00 |
| 5N1AT2MV6JC761592 | 2/23/2018 | 833300099 | 668765 | 1 | NEWVEHL | 26,541.00 |
| 1N4AL3AP7JC198803 | 2/23/2018 | 833300576 | 668742 | 1 | NEWVEHL | 23,496.00 |
| 5N1DR2MM4JC626081 | 2/23/2018 | 833302853 | 668789 | 1 | NEWVEHL | 38,214.00 |
| 5N1AT2MV2JC762951 | 2/23/2018 | 833305012 | 668762 | 1 | NEWVEHL | 26,541.00 |
| 1N4AL3AP7JC200484 | 2/26/2018 | 833343631 | 668744 | 1 | NEWVEHL | 23,496.00 |
| 5N1AT2MVXJC763491 | 2/26/2018 | 833344437 | 668763 | 1 | NEWVEHL | 26,541.00 |
| 5N1AT2MV2JC762299 | 2/26/2018 | 833344788 | 668750 | 1 | NEWVEHL | 26,541.00 |
| 5N1DR2MM9JC636735 | 2/26/2018 | 833348596 | 668791 | 1 | NEWVEHL | 38,214.00 |
| 1N4AL3AP3JC189404 | 2/26/2018 | 833349137 | 668747 | 1 | NEWVEHL | 24,322.00 |
| 1N4AL3AP7JC202350 | 2/26/2018 | 833349781 | 668745 | 1 | NEWVEHL | 23,496.00 |
| 3N1AB7AP8JL621934 | 2/26/2018 | 833350311 | 75752 | 1 | NEWVEHL | 19,650.00 |
| 1N6AA1E57JN507149 | 2/28/2018 | 833408014 | 668821 | 1 | NEWVEHL | 46,811.00 |
| 5N1DR2MM9JC644026 | 3/2/2018 | 833459541 | 75749 | 1 | NEWVEHL | 36,410.00 |
| KNMAT2MV2JP548958 | 3/5/2018 | 833482519 | 668775 | 1 | NEWVEHL | 29,036.00 |
| 3N1AB7AP0JY266440 | 3/5/2018 | 833483536 | 668739 | 1 | NEWVEHL | 19,650.00 |
| 3N1AB7AP1JY269024 | 3/5/2018 | 833483718 | 660467 | 1 | NEWVEHL | 21,329.00 |
| 3N1AB7AP8JY258098 | 3/5/2018 | 833484436 | 660469 | 1 | NEWVEHL | 24,449.00 |
| KNMAT2MV4JP547780 | 3/6/2018 | 833499929 | 668779 | 1 | NEWVEHL | 29,036.00 |
| KNMAT2MV7JP547644 | 3/6/2018 | 833500171 | 668778 | 1 | NEWVEHL | 29,036.00 |
| KNMAT2MV7JP549085 | 3/6/2018 | 833500182 | 668773 | 1 | NEWVEHL | 29,389.00 |
| JN1BJ1CR3JW207795 | 3/7/2018 | 833530872 | 655330 | 1 | NEWVEHL | 27,500.00 |
| KNMAT2MV8JP548964 | 3/7/2018 | 833532098 | 668777 | 1 | NEWVEHL | 29,036.00 |
| 5N1AT2MV9JC754152 | 3/7/2018 | 833533505 | 75748 | 1 | NEWVEHL | 34,407.00 |
| 5N1AZ2MH0JN131595 | 3/7/2018 | 833533736 | 668781 | 1 | NEWVEHL | 41,224.00 |
| 3N1AB7AP5JY269351 | 3/7/2018 | 833535042 | 660465 | 1 | NEWVEHL | 21,329.00 |
| 3N1AB7AP6JY270282 | 3/8/2018 | 833563274 | 668737 | 1 | NEWVEHL | 19,600.00 |
| 3N1CN7AP6JL862147 | 3/9/2018 | 833575352 | 668723 | 1 | NEWVEHL | 16,868.00 |
| 3N1AB7AP0JY273999 | 3/9/2018 | 833576203 | 75750 | 1 | NEWVEHL | 19,440.00 |
| 3N1AB7AP3JL627821 | 3/9/2018 | 833576721 | 668740 | 1 | NEWVEHL | 19,650.00 |
| 3N1AB7AP7JL627031 | 3/9/2018 | 833577877 | 660460 | 1 | NEWVEHL | 19,650.00 |
| 3N1AB7AP9JL626849 | 3/9/2018 | 833578466 | 660464 | 1 | NEWVEHL | 19,650.00 |
| 1N6AA1E53JN512154 | 3/9/2018 | 833580114 | 668813 | 1 | NEWVEHL | 44,334.00 |

**EXHIBIT B**

| | | | | | |
|---|---|---|---|---|---|
| 3N1AB7AP6JY270928 | 3/9/2018 | 833580209 | 75751 | 1 NEWVEHL | 19,650.00 |
| 1N6AD0EV8JN729359 | 3/12/2018 | 833615867 | 668812 | 1 NEWVEHL | 30,162.00 |
| KNMAT2MV6JP548946 | 3/12/2018 | 833617614 | 668776 | 1 NEWVEHL | 29,036.00 |
| 3N1AB7AP1JL624951 | 3/13/2018 | 833645689 | 660462 | 1 NEWVEHL | 19,650.00 |
| 3N1AB7APXJL627105 | 3/13/2018 | 833647616 | 660459 | 1 NEWVEHL | 19,650.00 |
| 3N1AB7AP9JL630626 | 3/17/2018 | 833729855 | 75754 | 1 NEWVEHL | 19,650.00 |
| 3N1CE2CP2JL362339 | 3/17/2018 | 833730007 | 668724 | 1 NEWVEHL | 17,608.00 |
| 3N1CN7APXJL843312 | 3/17/2018 | 833730010 | 668721 | 1 NEWVEHL | 13,207.00 |
| 3N1CN7AP4JL838302 | 3/17/2018 | 833730167 | 668722 | 1 NEWVEHL | 15,309.00 |
| 3N1AB7APXJL625404 | 3/17/2018 | 833730923 | 660461 | 1 NEWVEHL | 19,650.00 |
| 3N1AB7AP6JL628039 | 3/17/2018 | 833731447 | 668738 | 1 NEWVEHL | 19,600.00 |

**1,305,746.00**

## FRAMEWORK AGREEMENT

This Framework Agreement (the "Agreement") is entered into as of this 22 day of January, 2018, by and between Nissan North America, Inc. ("NNA" or "Nissan"), Michael Helmstetter (the "Owner") and New City Auto Group, Inc., the legal entity that owns or will own the proposed Dealership Point (each, a "Dealer Entity") and the legal entity that Owner proposes to own the real property and dealership facilities relating to the proposed Dealership Point and to be identified in the Facility Addendum in any Nissan Dealer Term Sales and Service Agreement ("Dealer Agreement") offered to Dealer Entity (the "Lessor") (each a "Party" and collectively, the "Parties").[1]

### RECITALS

WHEREAS, NNA seeks to improve its brand image and competitive position in the Market by promoting proven ownership and management of dealerships consistent with the commitments herein;

WHEREAS, Owner owns new vehicle dealerships and has considerable expertise relative to retailing new motor vehicles and desires to own and operate Nissan dealerships in the Market;

WHEREAS, Owner has independently evaluated the opportunity presented in the Market and, based on its own judgment, seeks to acquire one or more Nissan dealership(s) in the Market;

WHEREAS, Owner commits to being personally and actively involved in the management of the Dealership Point Owner proposes to acquire and commits to improving Nissan's brand image in the Market through improved sales and customer satisfaction performance, superior management and personnel and the other commitments included herein.

---

[1] Unless otherwise defined herein, capitalized terms used in this Agreement shall have the meanings ascribed to them in Schedule 1 or in the Addendum.

**EXHIBIT C**

**TERMS AND CONDITIONS**

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      Acquisition of the Dealership Point.   As applicable, and as more specifically described in Addendum A, Owner shall:

(a) independently use best efforts to acquire the Dealership Point according to the deadlines set forth in Addendum A (each, a "Market Action");

(b) execute a new Nissan Dealer (Term) Sales and Service Agreement (a "Dealer Agreement") related to the Market Action in the form and substance presented by NNA; and

(c) operate the Dealership Point in accordance with terms and conditions of that Dealer Agreement and this Agreement.

2.      Transition Payment(s). Subject to the terms of this Agreement and the compliance with all obligations herein, NNA shall make to Owner, Dealer Entity or Lessor a series of Transition Payments in the amounts and pursuant to the terms and schedule set forth in Addendum A (the "Transition Payments").   NNA shall not be required to make a Transition Payment if the Owner, Dealer Entity or Lessor (or counsel, if the payment is to be made to counsel) has not provided to NNA a completed W-9 or any other documentation that NNA may reasonably require. The Parties acknowledge and agree that the purpose of such payment(s) is (1) to induce the Owner to implement the Market Action(s) identified in Addendum A; and (2) as consideration for the promises made by Owner and Lessor herein, including without limitation and as set forth in Addendum B, the promises concerning the ownership, control and exclusive use of the facility to be acquired and used exclusively for Nissan Dealership Operations (as that term is defined in the Dealer Agreement).

3.      NNA's Approval of Market Actions.  Any proposed acquisition by Owner of a Nissan dealership as contemplated herein is subject to NNA's written consent.  Such consent will not be withheld so long as: (a) Owner is in full compliance with this Agreement; and

2

(b) such proposed Market Action complies with terms and conditions set forth in this Agreement and meets NNA's standard terms and applicable policies. If NNA does not consent to a proposed Market Action, Owner shall withdraw the proposed Market Action proposal and shall not challenge, either directly or indirectly, NNA's decision to withhold consent. NNA shall not be responsible for the consequences, including any costs, expenses or damages, resulting from actions taken by any third-party or governmental agency which results in the delay or prevention of the proposed Market Action.

4.    Performance Commitments. Owner acknowledges that achievement of the Performance Commitments is reasonable and justified based on Owner's evaluation of the Market and the existing and future economic conditions and business considerations.

5.    Facilities. Owner acknowledges that a facility in compliance with NNA standards is essential to the operational success of a Nissan dealership. Owner and Dealer Entity, as applicable, shall fulfill the Facility Commitments in the time and manner set forth in Addendum A. Owner and Dealer Entity shall cause the Nissan dealership facilities for the Dealership Point to maintain compliance with all applicable Nissan facility Guides (as that term is defined in a Dealer Agreement), NREDI standards and exclusivity policies (collectively, the "Facility Standards") at the location approved by NNA. If the Dealership Point does not meet or falls out of compliance with the Facility Standards, or is not or no longer in the location recommended by NNA as determined by a market study conducted in accordance with NNA's standard policies and procedures, Owner shall submit to NNA for approval a facility plan addressing any such deficiencies upon reasonable notice from NNA (a "Facility Plan"). Upon NNA's approval, the Facility Plan shall be deemed to be incorporated in Addendum A.

6.    NMAC. NNA and Owner acknowledge that Owner has the right to choose its sources of dealership financing. Because, however, it is contemplated that Owner shall have ownership in multiple Nissan dealerships, Owner agrees that the Dealer Entity shall apply to, and if approved, use Nissan Motor Acceptance Corporation ("NMAC") to the greatest extent possible for its dealership related commercial financing needs. Provided, however, that Owner

3

acknowledges that NMAC is a separate entity from NNA and makes its own independent decisions concerning the approval, execution and administration of any credit or finance agreement with Owner.

7.    Owner's Independent Evaluation.    Owner acknowledges that the Market Action is based upon Owner's independent analysis of the business opportunity in the Market.  Owner is relying upon its own evaluation and business plan in entering into this Agreement, and not on any representation, promise, agreement or information provided by NNA except as expressly set forth herein.

8.    Ownership of Multiple Dealerships.    Owner acknowledges that NNA's current policy limits the number of dealerships that may be owned by the same owner in a particular market, and to the extent that this Agreement requires NNA to approve an exception to such policy, such exception is hereby made by NNA in reliance on Owner's commitments as set forth herein and as further consideration for this Agreement.

9.    Market Actions.  Owner acknowledges that Nissan may take certain other dealer network actions, including the relocation of existing dealerships and the establishment of additional dealerships in the Market and that such actions are important to the success of the Nissan brand.

10.    Ownership:  During the Term, Owner shall maintain majority ownership and control of the Dealer Entity, and the Dealer Entity shall maintain majority ownership and control of the Dealership Point.  Owner or Dealer Entity may not sell, assign or otherwise transfer ownership of the Dealership Point during the Term.  For the Dealership Point, Owner also agrees that: (1) it shall submit for NNA's approval a successor addendum which identifies the proposed successor Principal Owner; and (2) in the event of the death or incapacity of Owner, NNA shall have the option to purchase the assets of the Dealership Point pursuant to the terms and procedures set forth in Addendum C.

11.    Operation of Dealership Point.  Owner shall cause the Dealer Entity to comply at all times with this Agreement and all applicable Dealer Agreements.   Owner further agrees

that the Dealer Entity shall (i) at all times maintain a qualified Executive Manager acceptable to NNA in accordance with its standard policies and procedures that is responsible for and dedicated solely to the day-to-day Nissan dealership operations; (ii) hire and maintain personnel at the dealership sufficient to meet the projected sales and service business; and (iii) participate and fully comply with all applicable guidelines of the One-to-One Rewards and Certified Pre-Owned Programs. Owner agrees that the Dealership Point shall meet all applicable Nissan Light Commercial Vehicle ("LCV") requirements and standards.

12.    Effectiveness/Term. This Agreement shall become effective upon execution by the Parties and, unless terminated earlier pursuant to the terms hereof, or by written agreement of the Parties, shall continue for a period of ten (10) years following completion of the last Market Action identified in Addendum A, or for the period through the date of the last Transition Payment, whichever is later (the "Term").

13.    Owner's Financial Information and Business Plan. Owner agrees to provide to NNA such financial and business information and plans for the Dealership Point upon reasonable, written request from NNA.

14.    No Assignment. Owner may not assign or transfer this Agreement without the express written consent of NNA, which consent may be withheld in NNA's sole discretion.

15.    Financial Covenants.

(a)    Owner acknowledges that maintaining sufficient capitalization, net worth and financing is essential to the operational success of a dealership. Owner shall cause the Dealer Entity to maintain all financing, capitalization, and net worth, as may be required by NNA guides established from time to time.

(b)    Owner agrees that if a Dealer Entity were to initiate a bankruptcy or insolvency proceeding, in order to protect NNA's interests (and the interests of Nissan customers) such Dealer Entity must meet all applicable obligations as set forth in the Dealer Agreement. As the Dealer Entity is bound by the terms of this Agreement, there can be no sale, assignment or transfer of all or substantially all of any such Dealer Entity's assets contingent upon NNA approving the buyer as an authorized Nissan dealer unless (1) any existing defaults under this Agreement are cured; and (2) the proposed assignee agrees to meet all applicable obligations and commitments herein.

16.    Time is of the Essence. Time is of the essence in all matters set forth herein.

5

17.    Agreement Separate from Dealer Agreement. This Agreement shall survive the execution of a Dealer Agreement, and in the event of any conflict between the terms of any Dealer Agreement and this Agreement, the terms of this Agreement shall govern.   This Agreement is not a Dealer Agreement and does not authorize or entitle Owner or a Dealer Entity to operate as an authorized Nissan dealer or to utilize Nissan's trademarks.   Such authority may be granted only pursuant to a duly-executed Dealer Agreement.   Enforcement by NNA of any remedies in this Agreement is separate from enforcement of any remedies under a Dealer Agreement (or any applicable state or federal law).   For all matters, Nissan retains all rights and remedies as set forth in the Dealer Agreement.

18.    Events of Default and Performance Defaults

(a)    Events of Default.  NNA shall be entitled to the remedies set forth in ¶19 upon occurrence of any of the following (each an "Event of Default"):

    (i)    Breach by Owner, Dealer Entity or the Lessor of the covenants or obligations in ¶¶1(a), 10, 14, 15(b), 21 or 23, as applicable.

    (ii)    Breach by Owner, the Dealer Entity, or Lessor of the covenants or obligations in ¶¶1 (b) or (c), 5, 11, 15(a), or 22, as applicable, if not cured within 60 days of receipt of written notice from NNA that Owner, Dealer Entity, and/or Lessor has breached such covenants and obligations.

    (iii)    Other events:

        (1)    Voluntary termination by Owner or the Dealer Entity of a Nissan Dealer Agreement for the Dealership Point for any reason;

        (2)    Termination under Sections 12A, 12B, or 12C of a Dealer Agreement for the Dealership Point by NNA; and/or

        (3)    by either the Dealer Entity or Owner: an admission, in writing of an inability to pay its debts generally; the filing a petition in bankruptcy, insolvency, reorganization or similar proceeding under any applicable law (which was not vacated, set aside or dismissed within sixty (60) days); the making of an assignment for the benefit of its creditors; or acquiescence in the appointment of a receiver.

(b)    Performance Defaults.  Failure by the Dealer Entity to achieve the Performance Commitments set forth in Addendum A shall constitute a Performance Default entitling NNA to the Performance Commitment Remedies set forth in Addendum A.

6

(c)    <u>Exclusive Use and Site Control Defaults.</u>  Breach by Owner, Dealer Entity or Lessor of the covenants and obligations set forth in Addendum A or Addendum B shall constitute a default entitling NNA to (i) repayment of the Transition Payment(s) received by Owner, Dealer Entity or Lessor and/or (ii) remedies set forth in Addendum A or Addendum B.

19.    <u>Remedies.</u>  NNA shall have the following remedies for an Event of Default set forth in paragraph 18(a):

(a)    <u>Termination of Agreement.</u>  NNA shall be relieved of any obligation to continue to perform hereunder and as set forth in the Default Notice may terminate this Agreement in its entirety or with respect to the Dealership Point set forth in Addendum <u>A</u>.

(b)    <u>Cancellation or Withholding of Transition Payments.</u>  NNA shall not be obligated to make any further Transition Payments and may withhold or cancel any payment otherwise scheduled to be made.

(c)    <u>Repayment of Transition Payments.</u>  Upon written demand to Owner, Dealer Entity, or Lessor NNA shall be entitled to repayment, jointly and severally from Owner, Dealer Entity, and Lessor of some or all Transition Payment(s) upon such terms specified in the demand.

(d)    <u>Option to Purchase / Divestiture / Assignment of Lease.</u>  NNA shall have the right (1) to purchase the Dealership Assets (as such term is defined in Addendum C) of any Dealer Entity in default pursuant to the terms and procedures set forth in <u>Addendum C</u> (the "<u>Purchase Option</u>"); (2) to require Owner within 180 days of receipt of the Default Notice to cause such Dealer Entity to sell its assets to a third party acceptable to NNA in its sole discretion, but who NNA agrees shall be acceptable if the proposed dealer is an existing Nissan dealer in good standing and who meets all applicable Nissan standards and guidelines and commits to meeting the applicable Performance Commitments on terms acceptable to NNA as set forth herein; or (3) to require an assignment to NNA or its designee of all leasehold rights to the Nissan Facility pursuant to the terms and procedures set forth in <u>Addendum B</u>.  NNA's Purchase Option shall be freely assignable by NNA to any third party by written notice to Owner.  Owner on behalf of itself and the Dealer Entity agrees that NNA shall be entitled to injunctive relief and/or specific performance to enforce the provisions of this section and monetary damages would not be an adequate remedy for such breach.

20.    <u>Set off to Non-Vehicle Account.</u>  NNA may collect monies owed by Owner, Dealer Entity, or Lessor to NNA as a consequence of an Event of Default under this Agreement by charging the amount due to the Non-Vehicle Account of the Dealer Entity.  Owner also agrees that any monies due to Owner or the Dealer Entity by NNA shall be net of any indebtedness to NNA and that NNA may deduct any amounts due or to become due from

7

Owner, Dealer Entity, or Lessor to NNA, from any amounts held by NNA or which are due or to become due from NNA.

21.    Release. Owner, for itself, the Dealer Entity and the Lessor, and each of their respective affiliates, predecessors, successors, assigns, agents, or other representatives (the "Releasing Parties"), releases and forever discharges NNA, its affiliates, successors, assigns, directors, officers, employees, agents, or other representatives (the "Released Parties"), from all claims, demands, rights, causes of action, damages, liabilities, costs, or expenses (including attorneys' fees) which the Releasing Parties have or might have or acquire, whether known or unknown, actual or contingent, as of the date of the execution of this Agreement, which arise from, are related to, or associated in any way with, directly or indirectly, the negotiation and execution of this Agreement, its enforceability, or the acquisition, ownership or operation of any Nissan dealership, except for any indemnification rights pursuant to Section 11 of a Nissan Dealer Agreement.

22.    Dispute Resolution/Arbitration. All disputes arising out of or related to this Agreement shall be resolved by submission to mediation which, unless waived by written agreement, shall be conducted before an independent mediator agreeable to the parties at a location in Davidson or Williamson County, Tennessee. If the dispute is not resolved through mediation, and excluding only claims for injunctive relief or specific performance, then consistent with the provisions of the United States Arbitration Act (9 U.S.C. § 1, *et seq.*), the Parties agree that any such dispute shall be resolved through binding arbitration, which shall be the exclusive mechanism for resolving any dispute arising out of or related to this Agreement. The arbitration shall be conducted in accordance with the commercial rules and procedures of the American Arbitration Association, with arbitration hearings to be held in Davidson or Williamson County, Tennessee. There shall be a single arbitrator and the arbitrator shall have authority to award all appropriate relief, including specific performance and injunctive relief. Arbitration awards shall be binding and non-appealable, except as otherwise provided in the United States Arbitration Act. Judgment upon any such award may

8

be entered and enforced in any court of competent jurisdiction. The prevailing party in any action shall recover all costs, including reasonable attorney and expert fees, with interest thereon at the legally-applicable rate. The Parties acknowledge and agree that this Agreement (i) is not a contract under which any person is authorized to purchase any motor vehicle from NNA for resale to any other person, or to repair or service any vehicle offered by NNA; (ii) is therefore not a "motor vehicle franchise contract" within the meaning of 15 U.S.C. §1226; (iii) is not subject to or governed by the provisions of 15 U.S.C. §1226; and (iv) is subject fully to the provisions of the United States Arbitration Act, 9 U.S.C. §1, *et seq.*

23. Confidentiality. This Agreement is strictly confidential, and any disclosure thereof by Owner, Dealer Entity or the Lessor may cause significant harm to NNA. Owner covenants that, without the prior written consent of NNA, and except as required by law, Owner shall not disclose and shall cause the Dealer Entity and Lessor not to disclose to any person or entity (other than its agents or employees having a need to know such information in the conduct of their duties, and which agents or employees shall be bound by a similar undertaking of confidentiality), the existence or terms of this Agreement, the negotiations leading to this Agreement, or any of the underlying transactions. Owner agrees that these confidentiality obligations do not limit, modify or nullify any prior confidentiality undertakings to NNA and survive the termination or expiration of this Agreement. Owner further agrees that if it, the Dealer Entity, Lessor or any agent or employee violates this confidentiality undertaking Owner shall indemnify NNA for any losses, damages, claims or costs (including reasonable attorneys' fees) suffered or incurred by NNA as a result of such breach.

24. Additional Provisions.

(a) Execution by Counterparts. This Agreement may be executed in counterpart originals.

(b) Representation by Counsel/Voluntary Agreement. The Parties acknowledge that they have reviewed or had the opportunity to review this Agreement with their legal, tax, or other advisors, and are fully aware of all of their rights and alternatives. Owner further acknowledges and agrees that it has not been required in any way to enter into this Agreement but instead its execution, delivery and performance of this Agreement is entirely voluntary and free from any mental, physical, or economic duress or coercion of any kind, and following

9

consultation with counsel, agrees that this Agreement is binding and enforceable and Owner, Dealer Entity, and Lessor will not claim that any term or condition is invalid or otherwise unenforceable. Owner acknowledges and agrees that NNA is relying upon Owner's representations and acknowledgments, including in this section, in entering into the Agreement and but for such acknowledgements and representations it would not do so.

(c)   Challenge to Agreement.  In the event a protest or challenge of any nature by any third party which seeks to prevent, delay or invalidate this Agreement, in whole or in part (or seek other relief, including monetary damages), NNA shall have the right to suspend performance so long as such proceeding is pending (including any appeal); and if NNA is enjoined or if the Agreement or any material term is deemed invalid, unenforceable, or illegal, NNA may terminate this Agreement or suspend its performance without any liability to any person.

(d)   Entire Agreement.  Owner on behalf of itself and the Dealer Entity and Lessor acknowledges and agrees that Owner has not relied upon any covenants, promises, understandings, or agreements not set forth herein.  Owner further acknowledges that the mutual promises and covenants contained in this Agreement, and any documents to be executed in connection therewith, are the sole and total consideration and agreement of the Parties with respect to the subject matter of this Agreement and it supersedes any oral or written agreements with respect to the subject matter hereof.

(e)   No Oral Modification / NNA Approvals.  Owner acknowledges and agrees that any changes, modifications, amendments, or additions to this Agreement, or any approvals of NNA that may be required pursuant to this Agreement, shall not be valid unless in writing and for NNA must be signed by a Vice President. The Parties expressly waive the application of any local, state, or federal law, statute, or judicial decision allowing modifications, amendments, or additions notwithstanding an express provision requiring a writing signed by the parties. The parties agree that no representative of the other party is authorized to modify this Agreement or any of its terms, conditions, and requirements orally.

(f)   Due Authority:  Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement, whether on behalf of himself or herself and or any corporate entity executing this Agreement. Each Party represents and warrants to the other that the execution and delivery of the Agreement and the performance of such Party's obligations hereunder have been duly authorized and that the Agreement is a valid and legal agreement binding on such Party and enforceable in accordance with its terms.

(g)   Notices.  All notices, demands, requests, and other communications required or permitted under this Agreement shall be in writing and shall only be deemed properly given and received: (a) when actually given and received, if delivered in person to a Party; or (b) one (1) business day after deposit with a private courier or overnight delivery service for next-business-day delivery. All such notices shall be transmitted by one of the methods described above to the party to receive the notice at, in the case of notices to

10

If to Nissan

**Nissan North America, Inc.**
One Nissan Way
Franklin TN 37067
Attention: Director, Dealer Network Development

With a copy to

**Nissan North America, Inc.**
One Nissan Way
Franklin TN 37067
Attention: Legal Department

**Michael Helmstetter**

If to Owner and/or the Dealer Entity to:

Michael C. Moody, Esq.
O'Rourke & Moody, LLP
55 W Wacker Dr., Suite 1400
Chicago, IL 60601

If to Lessor to:

Michael C. Moody, Esq.
O'Rourke & Moody, LLP
55 W Wacker Dr., Suite 1400
Chicago, IL 60601

(h)    Attorney Fees.  In a dispute under or involving this Agreement, the prevailing party shall be entitled to recover all costs, including attorney and expert fees.

(i)    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Tennessee.

(j)    Special Terms.  Any terms not specifically addressed or set forth herein or any modifications thereto shall be as set forth in Addendum B.

[Rest of page intentionally left blank]

11

In WITNESS WHEREOF, the Parties have executed this Agreement effective as of the day and year first written above.

NISSAN NORTH AMERICA, INC.,

By: _____
    David Kershaw
    Vice President, Dealer Network Development


**New City Auto Group, Inc.**

By: _____
Name: Michael Helmstetter
Title: _Pres_


Owner **Michael Helmstetter**

By: _____
Name: Michael Helmstetter


**Lessor, New City Auto Group, Inc.**

By: _____
Name: Michael Helmstetter
Title: _Pres_

## ADDENDUM A

### COMMITMENTS AND COMMITMENT SCHEDULE

1.    Market Action.  Based on Owner's independent evaluation of the business opportunity in the Market, if applicable to this agreement and thus set forth in the Commitment Schedule below, Owner agrees to undertake the Market Action according to the terms, conditions and deadlines set forth in this Addendum A.  If Owner fails to complete a Market Action by the specified deadline, Nissan may in its sole discretion and in lieu of the remedies set forth in paragraph 18(c) or 19, upon written notice to Owner: (i) unilaterally amend the Agreement to exclude the Market Action and Dealership Point; or (ii) extend the deadline(s) for the Market Action to such dates determined by NNA.

2.    Facility Related Commitments.  As applicable and as set forth in the Commitment Schedule below, Owner agrees to take and to cause the Dealer Entity to take, the facility related actions in accordance with the terms, conditions and deadlines set forth in the Commitment Schedule below (the "Facility Commitments").

3.    Performance Commitments.  The Dealership Point, as applicable, shall achieve (1) the established State Sales Effectiveness Represented ("SSER") requirement, (2) achieve a minimum Service Contract Penetration, (collectively the "Performance Commitments") in accordance with the Commitment Schedule below.

4.    Performance Commitment Remedies.  If the Dealership Point is below the Performance Commitments for any Calendar Quarter (a "CQ"), NNA may withhold any further Transition Payments otherwise scheduled to be paid for the Dealership Point until the performance meets or exceeds the agreed-upon Performance Commitments for a full CQ, at which time, and so long as there is no Event of Default, NNA shall resume the quarterly Transition Payments. For the avoidance of doubt, any Transition Payments withheld that were otherwise scheduled to be paid are forfeited and not recoverable.

5.    Exclusive Use and Site Control.  Owner, Lessor and Dealer Entity agree that the Facility Commitments also include the promises and obligations set forth in Addendum B.

**MARKET ACTION:** *Acquisition of Nissan dealership operations in Schererville, IN PMA ("Dealership Point")*

## ACQUISITION AND FACILITY COMMITMENT DEADLINES FOR MARKET ACTION

| Deadline | Market Action |
|---|---|
| 01/31/2018 | Execute and close on buy-sell for Dealership Point; commence Nissan dealership operations. |
| 18 months after closing on the buy/sell for the Dealership Point | Owner/Lessor shall purchase the real property and dealership facilities relating to the Dealership Point. |
| 6/30/2019* | Owner/Dealer Entity shall commence the remodel/construction of the NREDI Dealership Facilities at the approved site. |
| 06/30/2020* | Owner/Dealer Entity shall successfully complete NREDI compliant Dealership Facilities at the approved site and successfully complete an NREDI Brand Audit. |

*\* Once final construction plans and scope have been received and approved by NNA, the NREDI commencement and completion deadlines may be revised as agreed to by the parties. Either party may request that the dates be revised; however, in no event should the facility completion deadline extend beyond December 31, 2020.*

## PERFORMANCE COMMITMENTS FOR MARKET ACTION

|  | SSER | Service Contract Penetration |
|---|---|---|
| Year 1 | 75% | 35% |
| Year 2 | 85% | 35% |
| Year 3 | 100% | 35% |
| Year 4 | 110% | 35% |
| Year 5 | 120% | 35% |
| Year 6 | 120% | 35% |
| Year 7 | 120% | 35% |
| Year 8 | 120% | 35% |
| Year 9 | 120% | 35% |
| Year 10 | 120% | 35% |

Performance Commitment tracking shall start during the first full month following the commencement of operations at the Dealership Point. Satisfaction of the Performance Commitments shall be assessed each calendar quarter ("CQ") (i) based on the 3 month average during the applicable CQ for the first three quarters of Year 1, and (ii) based on the 3 month average during the applicable CQ or a rolling twelve month average through the applicable CQ for all subsequent calendar quarters (4th quarter of Year 1 though Year 10).

2

**PAYMENT SCHEDULE :**

**Projected First Full Month of Evaluation:**                                    **February-2018**

| Transition Payments | | Event | Process Month | Payment Amounts |
|---|---|---|---|---|
| | | **Dealership Point** | | |
| A | | Compliance with Acquisition Commitment Deadline for Dealership Point, including the commitment to purchase the related real property and dealership facilities within 18 months of closing on the buy/sell for the Dealership Point:   Close on acquisition. | January 2018 | $1,000,000.00 |
| | | Payments subject to satisfaction of Performance Commitments for Dealership Point (For Identified CQs) | | |
| Year 1 | 1 | Feb 2018 - Apr 2018 | Jul-2018 | $25,000.00 |
| | 2 | May 2018 - Jul 2018 | Oct-2018 | $25,000.00 |
| | 3 | Aug 2018 - Oct 2018 | Jan-2019 | $25,000.00 |
| | 4 | Nov 2018 - Jan 2019 | Apr-2019 | $25,000.00 |
| Year 2 | 5 | Feb 2019 - Apr 2019 | Jul-2019 | $25,000.00 |
| | 6 | May 2019 - Jul 2019 | Oct-2019 | $25,000.00 |
| | 7 | Aug 2019 - Oct 2019 | Jan-2020 | $25,000.00 |
| | 8 | Nov 2019 - Jan 2020 | Apr-2020 | $25,000.00 |
| Year 3 | 9 | Feb 2020 - Apr 2020 | Jul-2020 | $25,000.00 |
| | 10 | May 2020 - Jul 2020 | Oct-2020 | $25,000.00 |
| | 11 | Aug 2020 - Oct 2020 | Jan-2021 | $25,000.00 |
| | 12 | Nov 2020 - Jan 2021 | Apr-2021 | $25,000.00 |
| Year 4 | 13 | Feb 2021 - Apr 2021 | Jul-2021 | $25,000.00 |
| | 14 | May 2021 - Jul 2021 | Oct-2021 | $25,000.00 |
| | 15 | Aug 2021 - Oct 2021 | Jan-2022 | $25,000.00 |
| | 16 | Nov 2021 - Jan 2022 | Apr-2022 | $25,000.00 |
| Year 5 | 17 | Feb 2022 - Apr 2022 | Jul-2022 | $25,000.00 |
| | 18 | May 2022 - Jul 2022 | Oct-2022 | $25,000.00 |
| | 19 | Aug 2022 - Oct 2022 | Jan-2023 | $25,000.00 |
| | 20 | Nov 2022 - Jan 2023 | Apr-2023 | $25,000.00 |
| Year 6 | 21 | Feb 2023 - Apr 2023 | Jul-2023 | $25,000.00 |
| | 22 | May 2023 - Jul 2023 | Oct-2023 | $25,000.00 |
| | 23 | Aug 2023 - Oct 2023 | Jan-2024 | $25,000.00 |
| | 24 | Nov 2023 - Jan 2024 | Apr-2024 | $25,000.00 |
| Year 7 | 25 | Feb 2024 - Apr 2024 | Jul-2024 | $25,000.00 |
| | 26 | May 2024 - Jul 2024 | Oct-2024 | $25,000.00 |
| | 27 | Aug 2024 - Oct 2024 | Jan-2025 | $25,000.00 |
| | 28 | Nov 2024 - Jan 2025 | Apr-2025 | $25,000.00 |
| Year 8 | 29 | Feb 2025 - Apr 2025 | Jul-2025 | $25,000.00 |
| | 30 | May 2025 - Jul 2025 | Oct-2025 | $25,000.00 |
| | 31 | Aug 2025 - Oct 2025 | Jan-2026 | $25,000.00 |
| | 32 | Nov 2025 - Jan 2026 | Apr-2026 | $25,000.00 |
| Year 9 | 33 | Feb 2026 - Apr 2026 | Jul-2026 | $25,000.00 |
| | 34 | May 2026 - Jul 2026 | Oct-2026 | $25,000.00 |

|  |  |  |  |  |
|---|---|---|---|---|
|  | 35 | Aug 2026 - Oct 2026 | Jan-2027 | $25,000.00 |
|  | 36 | Nov 2026 - Jan 2027 | Apr-2027 | $25,000.00 |
|  | 37 | Feb 2027 - Apr 2027 | Jul-2027 | $25,000.00 |
| Year 10 | 38 | May 2027 - Jul 2027 | Oct-2027 | $25,000.00 |
|  | 39 | Aug 2027 - Oct 2027 | Jan-2028 | $25,000.00 |
|  | 40 | Nov 2027 - Jan 2028 | Apr-2028 | $25,000.00 |
| Total |  |  |  | $2,000,000.00 |

**Payment Terms and Conditions:**

1. All payments are subject to the terms and conditions of the Framework Agreement and Addenda thereto.

2. Transition Payment A shall be payable within thirty (30) days of closing of the buy/sell for the Dealership Point. Transition Payment A will be subject to repayment and/or chargeback by Nissan in the event Owner, Dealer Entity, or Lessor, as applicable, fails to (i) purchase the real property and dealership facilities relating to the Dealership Point within 18 months of closing on the buy/sell for the Dealership Point or (ii) achieve its SSER performance commitments measured either on a 3 month rolling basis or 12 month rolling basis at the end of any quarter or year end as defined in the table above, in either year 1, or year 2 or year 3. Note: 12 month performance will only be measured when a full 12 calendar months of data is available. In addition, Transition Payment A will be subject to repayment and/or chargeback by Nissan as a result of an Event of Default.

3. $25,000 of Transition Payment A shall be allocated to, and deemed good, sufficient and valid consideration for, the rights and obligations related to Exclusive Use and Site Control as set forth in Addendum B of the Framework Agreement.   An additional $25,000 of Transition Payment A shall be allocated to, and deemed good, sufficient and valid consideration for, the rights and obligations related to NNA Purchase Option as set forth in Addendum C of the Framework Agreement.

4. Transition Payments (other than Transition Payment A) shall be paid in quarterly installments, subject to satisfaction of all applicable commitments relating to the Dealership Point and Owner/Dealer Entity remaining in full compliance with all terms and conditions of the Framework Agreement. Any quarterly Transition Payment that is not realized in a particular CQ shall be forfeited. Note: The first scheduled quarterly payment will be realized if the Security+Plus commitment is attained.

4

### ADDENDUM C

### NNA PURCHASE OPTION

NNA's Option To Purchase. NNA shall have the right, but not an obligation, to purchase the Dealership Assets in accordance with, and subject to, the terms and conditions herein (the "Purchase Option").

Dealership Assets. For purposes of this Agreement, the "Dealership Assets" means (i) any and all rights of the Dealer Entity to operate as an authorized Nissan Dealership; (ii) any and all good will associated with the Dealer Entity's Nissan dealership operations; (iii) any and all new, unused and unsold Nissan vehicles owned by the Dealer Entity which are otherwise eligible for purchase; (iv) any and all new, unused, unsold, and undamaged genuine Nissan parts owned by the Dealer Entity which are still in their original packaging and which the Dealer Entity purchased from NNA; and (v) any and all undamaged special tools and equipment owned by the Dealer Entity purchased from NNA. For the avoidance of any doubt, the Dealership Assets do not include (i) any assets relating to the Dealer Entity's operation of a dealership for any vehicle line-make other than Nissan; or (ii) any other rights or assets which are not set forth in subsections (i)-(v) herein.

At NNA's option, if the approved facility in the Dealer Agreement is leased to the Dealer Entity by a third party in which Owner has no direct or indirect beneficial ownership interest, NNA shall also have the right to an assignment of whatever leasehold interests may exist in favor of the Dealer.

NNA Purchase Notice. In the event that NNA elects to exercise the Purchase Option, NNA shall deliver to Owner and the Dealer Entity (or any successor) (for purposes of this Addendum C, Owner and Dealer Entity collectively shall be referred to as "Dealer Entity") a written notice (a "Purchase Notice") stating its intent to purchase the Dealership Assets and the price offered by NNA (the "NNA Price") and identifying whatever real estate or property related due diligence period may be required.

Dealer Entity Response. Within 30 days after the date of its receipt of the Purchase Notice (the "30-day period"), Dealer Entity shall notify NNA in writing whether it accepts or rejects the NNA Price contained in the Purchase Notice (such notification shall be referred to as "Dealer Entity Response").

If Dealer Entity accepts the NNA Price, or fails to provide NNA with the Dealer Entity Response within the 30-day period, Dealer Entity shall sell the Dealership Assets to NNA, free and clear of any and all liens, claims and encumbrances, at the NNA Price, and the sale shall close within 60 days after Dealer Entity's receipt of the Purchase Notice, or 30 days after NNA's completion of any environmental due diligence if the Dealership Assets include the dealership facility. At the closing on such sale, the Dealer Entity shall deliver to NNA an executed Voluntary Termination.

If Dealer Entity provides NNA with the Dealer Entity Response within the 30-day period and such response indicates that Dealer Entity rejects the NNA Price, NNA shall have the right to (i) withdraw its exercise of the Purchase Option on notice to Dealer Entity, in which case NNA shall have no obligation to purchase the Dealership Assets, or (ii) demand that the purchase price for the Dealership Assets be determined through arbitration (the "Valuation Proceeding") before a panel of three business valuation experts associated with the American Arbitration Association ("AAA"). The Valuation Proceeding shall take place in Franklin, Tennessee and shall be commenced by NNA's filing of a demand with the AAA within 30 days after NNA's receipt of Dealer Entity Response. Upon such filing, Dealer Entity shall participate

in the Valuation Proceeding and each of NNA and Dealer Entity shall be responsible for its own costs and expenses in connection with such Valuation Proceeding; provided, however, that NNA and Dealer Entity shall each pay 50% of any fees or costs payable to the Panel (as defined below). Dealer Entity further agrees that the arbitration obligation herein is binding and enforceable and that the Motor Vehicle Franchise Contract Arbitration Fairness Act, 15 U.S.C. Section 1226, does not apply to such obligation because, without limitation, this Agreement is not a "motor vehicle franchise contract" within the meaning of such provision. The only issue to be resolved in the Valuation Proceeding shall be the fair market value of the Dealership Assets. The Valuation Proceeding shall be conducted in accordance with the AAA's Commercial Arbitration Rules; provided, however, in the event of any conflict between such rules and this Agreement, the terms of this Agreement shall control.

The AAA panel for the Valuation Proceeding (the "Panel") will be determined as follows: NNA and Dealer Entity shall each select one arbitrator from the list of available business valuation experts identified by the AAA, and the third arbitrator shall be a business valuation expert selected solely by the AAA. The Panel shall be required to determine the fair market value for the Dealership Assets (the "Fair Market Value"). The Panel shall render its decision determining the Fair Market Value within 90 days of the commencement of the Valuation Proceeding; provided, however, that NNA may extend such deadline by up to 45 days. The Fair Market Value shall be determined as follows: (A) if at least 2 out of the 3 Panel members agree on a fair market value of the Dealership Assets, the Fair Market Value shall be equal to such fair market value, and (B) if at least 2 out of the 3 Panel members cannot agree on a fair market value of the Dealership Assets, each of the three Panel members shall provide his or her own fair market valuation of the Dealership Assets and the Fair Market Value shall be the average of the three valuations. In connection with a Valuation Proceeding, Dealer Entity shall provide NNA and each of the members of the Panel full access to, and copies of, Dealer Entity accounting and financial books and records, and any other information requested by NNA or the Panel concerning Dealer Entity's Nissan dealership, for the purpose of valuing the Dealership Assets.

If the NNA Price equals or exceeds the Fair Market Value, Dealer Entity shall sell the Dealership Assets to NNA at a price equal to the Fair Market Value and shall close on the sale of the Dealership Assets to NNA, free and clear of any liens, claims or encumbrances, within 30 days after the Panel's decision. At the closing, Dealer Entity shall deliver to NNA an executed Voluntary Termination.

If the Fair Market Value exceeds the NNA Price, NNA shall have the option to (A) purchase the Dealership Assets, free and clear of any liens, claims or encumbrances, at a purchase price equal to the Fair Market Value within 30 days after the Panel's decision, or (B) withdraw its exercise of the Purchase Option on notice to the Dealer Entity, in which case NNA shall have no obligation to purchase the Dealership Assets. If NNA elects to purchase the Dealership Assets at a purchase price equal to the Fair Market Value, the closing shall take place within 30 days of NNA's written notice in accordance with this section, and at the closing the Dealer Entity shall deliver to NNA an executed Voluntary Termination.

NNA's Right To Assign Option. NNA shall have the right, at any time, to assign the Purchase Option and all of NNA's rights hereunder to any person or entity (an "Assignee"). In the event NNA assigns such rights to an Assignee, the Assignee shall have all of the rights as are granted to NNA herein, and all references to NNA shall apply equally to the Assignee; provided, however, that if NNA has designated an Assignee hereunder, NNA shall have the right to participate in the Valuation Proceeding.

2

### SCHEDULE 1 – DEFINITIONS

As used in this Agreement, the following terms have the following meanings:

(a)    **Close or Closing**, as may be applicable with respect to a Market Action, shall mean the legal transfer to the Owner/or a Dealer Entity of the dealership assets of and/or the issuance by NNA of a new dealer code authorizing the Owner/Dealer Entity to commence authorized dealership operations.

(b)    **Dealer Agreement** means a Nissan Dealer Sales and Service Agreement executed or to be executed by and between NNA and Dealer Entity for either an existing Nissan dealership the proposed Dealership Point.

(c)    **Dealer Entity** means the legal entity in which the Owner has a majority and controlling ownership interest and through which Owner owns and operates existing new vehicle dealerships or by which Owner proposes to own and operate the Proposed Dealership(s).

(d)    **Dealership Point** shall be the dealership or potential dealerships as described in the Schedule in Addendum A.

(e)    **Divest or Divesture** means for an Owner or Dealer Entity to sell, transfer or otherwise dispose of all legal and beneficial ownership interest in the shares or assets of a Nissan Dealership in accordance with the terms and conditions applicable to a sale or transfer under the Dealer Agreement.

(f)    **LCV** means Light Commercial Vehicle and any then-applicable Nissan facility and operating requirements relating to the sale of Light Commercial Vehicles.

(g)    **Market** means the Chicago metropolitan market, as defined by Nissan from time to time.

(h)    **Market Actions** mean the dealer network actions identified in Addendum A.

(i)    **NREDI** means the provisions of the Nissan Retail Environmental Design Initiative and all of its requirements.

(j)    **Owner** means the person and/or entity identified on page one of this Agreement which owns and operates, directly or indirectly, certain new vehicle dealerships.

(k)    **PMA** and **PMAs** has the meaning set forth in the Dealer Agreement and/or as identified in Addendum A.

(l)    **Principal Owner** means the person identified in the Dealer Agreement who shall have full legal authority and ultimate managerial authority over a Nissan dealership.

(m)    **Purchase Option** means the rights granted to NNA to purchase the Dealership Assets pursuant to the terms and procedures set forth in Addendum C.

(n)    **State Sales Effectiveness Represented ("SSER")** means the sale performance measurement used by NNA in the ordinary course of its business that calculates the ratio of a dealer's sales penetration to the average sales penetration of Nissan dealers in represented market areas in the State where the Dealership Point is located on a segment adjusted basis.

(o)    **Service Contract Penetration** is a measurement used by NISSAN to evaluate a dealer's sale of Nissan Security+Plus Plan service contracts. The method to calculate this penetration shall be the same as used for calculating dealer's Nissan Security+Plus dividend under the Nissan Security+Plus dealer dividend program in effect at the time of the applicable performance tracking period.